1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>                 vs.<br><br><br>SEAUN FORD,<br><br>                                    Defendant. | Case No.:  3:24-cr-2739-BTM<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**<br><br>**[ECF No. 17]** |

Before the Court is Defendant Seaun Ford's Motion to Suppress.  (ECF No. 17.) The Court held evidentiary hearings on May 12, May 22, June 5, June 16, and August 7, 2025.  For the reasons discussed below, the Court **DENIES** Ford's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On the evening of October 11, 2024, San Diego Sherriff's Deputy Dillon Fuston was

---

[1] The following facts are found from the evidence presented at the evidentiary hearings the Court held on May 12, May 22, June 5, June 16, and August 7, 2025.

1  on patrol in a marked police vehicle near the intersection of Jamacha Boulevard and Campo

2  Road.  Deputy Fuston observed a Silver Chrysler 300 stop over a limit line.  Deputy Fuston

3  then ran a records check of the license plate of the Chrysler 300 using the computer in his

4  patrol car, which showed that the registration of the Chrysler 300 had expired in July 2023.

5  Deputy Fuston decided to initiate a traffic stop of the Chrysler 300, and activated his patrol

6  car's overhead lights and siren and maneuvered behind the vehicle.

7       The Government and Ford dispute what occurred after Deputy Fuston activated his

8  lights and siren.  Deputy Fuston testified that as he was driving behind the Chrysler 300,

9  he saw the driver of the car turn to look at Deputy Fuston, and then communicate with the

10  person in the front passenger seat of the car.  According to Deputy Fuston, he then saw the

11  driver reach towards his waistband, saw the center console of the Chrysler 300 open, saw

12  the driver and passenger of the car reach towards the center console, and then saw the

13  center console close.  In contrast, Ford contends that Deputy Fuston would not have been

14  able to clearly see what was happening inside the Chrysler 300 while he was driving behind

15  the vehicle, and so disputes that Deputy Fuston observed any movement near the center

16  console during this time.

17       The Court makes the following finding of fact as to the disputed testimony:  After

18  the lights and siren were activated by Deputy Fuston, Ford looked in his direction and

19  Deputy Fuston saw the center console open and Ford make a movement which Deputy

20  Fuston interpreted as Ford handing something to the passenger.

21       After Deputy Fuston activated his lights and siren, the Chrysler 300 drove for about

22  a quarter of a mile before pulling over on the side of the road.  Deputy Fuston thought that

23  the Chrysler 300 was, from his perception, "driving slowly" before pulling over.  The

24  Chrysler 300 pulled over about a minute and 20 seconds after Deputy Fuston turned on the

25  lights and siren.  The vehicle pulled over and stopped when it was clearly safe to do so.

26  Deputy Fuston believed from his experience that the driver was delaying stopping so he

27  could hide something in the center console.  Deputy Fuston exited his vehicle and walked

28  to the front passenger-side window of the Chrysler 300.  The body camera footage indicates

that Deputy Fuston first interacted with Ford, who was the driver of the vehicle, and the vehicle's passenger around 11:34:47 p.m.  The body camera footage shows that the passenger was holding a cigarette in her hand.  Deputy Fuston asked Ford and the passenger to provide identification, which they did.  Deputy Fuston also asked if anyone in the vehicle had ever been arrested, and if there were any weapons in the vehicle.  Deputy Fuston also told Ford and the passenger that he had observed movement in the vehicle and that it looked like they had reached towards the center console, and asked what that "was all about." Deputy Fuston testified that the passenger stated that there had been no movement near the center console.  Deputy Fuston repeated the question, and testified that it was his recollection that the passenger then told him that she and Ford had passed a cigarette between each other.

Deputy Fuston then called for backup around 11:38:00 p.m., a little over 3 minutes into his encounter with Ford and the passenger.  While waiting for backup to arrive, Deputy Fuston asked Ford and the passenger if there was anything illegal in the vehicle.  Deputy Fuston testified that he believed Ford and the passenger both said there was not.

Backup quickly arrived around 11:41:45 p.m.  When backup arrived, Deputy Fuston walked to the driver-side front door and told Ford to step out of the vehicle.  Ford opened his door and stepped out of the vehicle at around 11:42:06 p.m., which was around 7 minutes and 19 seconds into Deputy Fuston's encounter with Ford.  Deputy Fuston then conducted a pat-down of Ford while the driver-side front door remained open.  Deputy Fuston observed a methamphetamine pipe in the open door's pocket while conducting the pat-down.  After completing the pat-down, Deputy Fuston had Ford move to the rear of his vehicle and sit on the sidewalk.  As Ford began to walk to the rear of the car, he closed the front door of his car with his left elbow.  While Ford was sitting on the sidewalk, Deputy Fuston said that he was going to do a pat-down of the vehicle because he thought there might be a weapon concealed in the vehicle.  Deputy Fuston asked Ford if he wanted to "come clean" about anything and asked if there might be a little dope in the car, to which Ford responded that there was not.  Deputy Fuston then said again that he saw Ford and

3

the passenger pass something between each other, and Ford responded that they had been passing a cigarette.

Deputy Fuston then opened the driver-side front door of the car and shined a flashlight on the methamphetamine pipe in the door's pocket. Deputy Fuston then opened the car's center console, in which there was a black Smith and Wesson handgun. Deputy Fuston seized the gun and removed it from the car and placed Ford under arrest. Officers also removed from the Chrysler 300 the methamphetamine pipe and multiple plastic bags containing white and brown substances from the vehicle, which later tested positive for methamphetamine. Ford now moves to suppress the evidence seized from his vehicle as the fruits of an unlawful search that violated the Fourth Amendment.

## II.    DISCUSSION

### A. <u>Deputy Fuston's Credibility</u>

At the evidentiary hearings, Ford challenged the credibility of Deputy Fuston's testimony. One of the ways Ford did so was by seeking to introduce into evidence transcripts of disciplinary proceedings regarding Deputy Fuston held before the Commission on Peace Officer Standards and Training and the Commission's Peace Officer Standards Accountability Board. The Government objected to the introduction of these transcripts into evidence as prohibited by Federal Rule of Evidence 608(b) at the evidentiary hearing on May 22, 2025. Rule 608(b) provides: "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." At the evidentiary hearing held on June 5, 2025, the Court ruled from the bench that the transcripts may be introduced into evidence and stated that it would fully explain its reasoning for doing so in its written opinion.

The Government cited *United States v. Brewer*, 947 F.2d 404 (9th Cir. 1991), as support for its argument that the Federal Rules of Evidence apply at evidentiary hearings. *Brewer* did hold that "the Federal Rules of Evidence apply in pretrial suppression proceedings pursuant to Rule 1101(d) because such evidentiary hearings are not expressly

excluded under Rule 1101(d)(2) and Rule 1101(d)(3)."  947 F.2d at 410.  However, the Ninth Circuit did so in the context of determining whether Rule 615, which mandates the exclusion of witnesses from the proceedings at the request of a party, applied to evidentiary hearings conducted to resolve factual issues presented in a motion to suppress evidence.  *Id.* at 405, 410.  The Ninth Circuit also acknowledged that the Supreme Court held in *United States v. Matlock* that hearsay evidence ***is*** admissible at suppression hearings.  *Id.* at 410 (citing *Matlock*, 415 U.S. 164, 172–73 (1974) ("[I]t should be recalled that the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."")).  The Ninth Circuit distinguished *Matlock* by stating that "*Matlock* does not support the notion that *procedural* rules designed to protect the integrity of the fact finding process are inapplicable in a suppression hearing."  *Brewer*, 947 F.2d at 410.

Post-*Brewer*, the Ninth Circuit has regularly re-affirmed that "both the U.S. Supreme Court and this circuit hold that a trial judge is not bound by the hearsay rule in making preliminary determinations during suppression hearings."  *United States v. Erevia-Suarez*, 132 F.3d 40, 1997 WL 759111, at *1 (9th Cir. 1997); *see also United States v. Oceguerra-Aguirre*, 70 F. App'x 473, 475 (9th Cir. 2003) ("[A]lthough the statements could be classified as hearsay, the district court did not err in considering the evidence during a motion to suppress hearing.").  The Federal Rules of Evidence therefore clearly do not apply in full force at suppression hearings.  The Court interprets *Brewer* as holding that the Federal Rules of Evidence that affect the integrity of the proceedings, such as the sequestration of witnesses under Rule 615, apply at evidentiary hearings.  However, Rule 608(b) concerns the way parties may impeach a witness's testimony, and specifically prohibits the introduction of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  The purpose of Rule 608(b) is not to protect the integrity of the proceedings, but rather to prevent delay and confusion by avoiding a mini-trial regarding a witness's prior acts of honesty or dishonesty.  *See United States v. Burns*, Nos. 98-50771, 98-50772, 99-50025, 2000 WL

898739, at *4 (9th Cir. July 6, 2000) (unpublished) ("This extrinsic evidence would have created a mini-trial on [the witness's] past behavior, the very distraction Rule 608 seeks to guard against."). Therefore, the Court holds that Federal Rule of Evidence 608 does not apply at suppression hearings and admits the transcripts into evidence.

The first transcript is of a hearing that took place on March 21, 2024, before the Commission on Peace Officer Standards and Training's (the "Commission") Peace Officer Standards Accountability Advisory Board (the "POSAAB"). The POSAAB's role was to "determine only if the matter will proceed forward for Commission review and then, should the Commission approve, for a full evidentiary hearing before an administrative law judge to determine whether the allegations are true and justify discipline." (Transcript of March 21, 2024 POSAAB Hearing, at 32.) The transcript further states that "[n]o actions by the Board or the Commission prior to the full evidentiary hearing amount to a final determination that the officer did, in fact, engage in serious misconduct." (*Id.*)

The matter before the POSAAB concerned an incident that occurred in April 2020 in which Deputy Fuston used force on a suspect as a San Diego Police Department officer. The Peace Officer Standards Accountability Division (the "Division") had determined that Deputy Fuston had been dishonest in how he described the incident in both his police report and an investigative interview. The Division presented its findings to the POSAAB at the hearing. Deputy Fuston and his attorney also made statements. The POSAAB ultimately voted to recommend revoking Deputy Fuston's Peace Officer Standards and Training ("POST") certificate, with four board members voting in favor of recommending revocation and two voting against. (*Id.* at 81–82.)

The second transcript is of a hearing that took place on June 12, 2024, before the Commission. The Commission's role was to determine whether to accept the POSAAB's recommendation to revoke Deputy Fuston's POST certificate. The Division presented its findings to the Commission, and Deputy Fuston and his attorney also spoke again. The Commission ultimately voted against revoking Deputy Fuston's POST certificate, with two Commissioners voting to revoke and six voting to not revoke. (Transcript of June 12, 2024

6

Commission Hearing, at 81–82.)  The matter therefore never proceeded to an evidentiary hearing before an administrative law judge, and so there was never a final determination regarding whether Deputy Fuston had been dishonest.  The Court finds that the transcripts do not undermine Deputy Fuston's testimony at the evidentiary hearing in this case.

Further, the Court finds Deputy Fuston to be a credible witness based on his demeanor while testifying and the other evidence.  Specifically, the Court finds that Deputy Fuston did see some sort of movement occur near the center console of the Chrysler 300 as he drove behind the vehicle after activating his lights and siren.  Footage from Deputy Fuston's body-worn camera also corroborates his testimony that he saw movement near the center console.  *First*, before Deputy Fuston searched the Chrysler 300 and while Ford was sitting on the sidewalk, Deputy Fuston told Ford that he had seen Ford and the passenger pass something near center console.  Ford responded that he and the passenger were passing a cigarette.  This corroborates Deputy Fuston's testimony that there was indeed some sort of movement near the center console.  *Second*, the first part of the Chrysler 300 that Deputy Fuston searched was the center console, which further corroborates his testimony that he had seen something happen near that area of the vehicle while pulling it over.

## B. **Deputy Fuston's Traffic Stop of Ford's Vehicle was Lawful**

Law enforcement officers may conduct a traffic stop of a vehicle if an officer has probable cause to believe a traffic violation has occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996).  Deputy Fuston witnessed the vehicle stop over a limit line.  He then ran a records check on Ford's license plate, which informed Deputy Fuston that the vehicle's registration had expired in July 2023.  Deputy Fuston therefore had probable cause to believe that two traffic violations had occurred, and so his stop of Ford's vehicle did not violate the Fourth Amendment.

## C. **Deputy Fuston's Order that Ford Exit his Vehicle was Lawful**

The Government argues that it was proper for Deputy Fuston to order Ford out of his vehicle around 7 minutes into the traffic stop for two main reasons: 1) after initiating

24-cr-2739-BTM

the traffic stop, Ford took longer than necessary to stop his vehicle, and 2) Deputy Fuston witnessed furtive movements around the center console of the vehicle while driving behind Ford's vehicle.  The Government argues that these events gave Deputy Fuston reasonable suspicion that Ford was attempting to hide something before he pulled over his car. Therefore, the Government argues, after initiating the traffic stop Deputy Fuston acquired reasonable suspicion to believe that additional criminal activity was afoot beyond just the traffic violations, and so he was justified in conducting additional investigation by ordering Ford out of his vehicle.

In response, Ford not only contends that Deputy Fuston did not see any movement in the Chrysler 300 near the center console while pulling over the vehicle, but also argues that it was not suspicious that Ford took around a quarter of a mile to stop his vehicle after Deputy Fuston initiated the stop because Ford was simply attempting to find a safe place to park his car.  Therefore, Ford argues, Deputy Fuston's request that Ford exit his vehicle was an improper "fishing expedition" and an unlawful search in violation of the Fourth Amendment.

Although the Court finds that Deputy Fuston had reasonable suspicion that Ford and the passenger were hiding something, that level of suspicion was not required in order for him to order Ford to exit the vehicle.  An officer may *always* order a driver to exit his vehicle during a lawful traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, [a] police officer[] may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").  Law enforcement may do so regardless of "[w]hether . . . police officers are confronted with multiple factors indicating danger, *or whether the situation appears normal and benign*." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (emphasis added).  This is because "traffic stops are 'especially fraught with danger to police officers,'" and the "government's 'legitimate and weighty' interest in officer safety . . . outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the

vehicle." *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983) and *Mimms*, 434 U.S. 106 at 110–11). Indeed, the Ninth Circuit has made clear that an "officer['s] subjective motivations are irrelevant" when ordering a driver out of his vehicle during a traffic stop "because 'the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.'" *United States v. Taylor*, 60 F.4th 1233, 1240 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 828 (2024) (quoting *Whren*, 517 U.S. at 814) (explaining that officers could "could have [the driver] exit his vehicle in the interest of officer safety" regardless of "whether the officers may have subjectively believed they were on to something more than a vehicle lacking license plates."); *see also United States v. Steinman*, 130 F.4th 693, 705–06 (9th Cir. 2025) (noting that "even if [the officer] was subjectively motived by a desire to question [the driver] further, that is irrelevant because [the officer's] 'subjective motivations,' whatever they may have been, could not change the objective reasonableness" of his request that the driver exit his vehicle).

The case law therefore makes clear that had Deputy Fuston ordered Ford to exit his vehicle at the immediate commencement of the traffic stop, that action certainly would have been lawful. However, Deputy Fuston did not do so until around seven minutes and 19 seconds into his interaction with Ford. "[A] traffic stop must be limited in its scope: an officer may address the traffic violation that warranted the stop, make ordinary inquiries incident to the traffic stop, and attend to related safety concerns. . . . The stop may last no longer than is necessary to effectuate these purposes and complete the traffic mission safely." *Id.* at 703 (internal quotations omitted). "[A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 704 (internal quotations omitted). When a traffic stop is justified at its inception, as is the situation here, a court's "analysis is twofold[: w]as the stop prolonged, and, if so, was the prolongation justified by reasonable suspicion based on the information available at that juncture?" *Id.* Therefore, if Deputy Fuston prolonged the traffic stop without justification by waiting over 7 minutes to order Ford to exit his vehicle,

he violated the Fourth Amendment.

The Court finds that Deputy Fuston did not prolong the stop without justification. Deputy Fuston waited to ask Ford and the passenger to leave the vehicle because he did not want to do so until backup arrived. There were two people in the car and it was dark. The body camera footage shows Deputy Fuston called for backup only around 3 minutes after first approaching Ford's vehicle. It was reasonable for him to wait for backup to arrive before asking Ford to exit the vehicle given that Deputy Fuston had seen movements indicating Ford and the passenger may have hidden something in the center console. Additionally, although there may have been an innocent reason for Ford to have waited a quarter of a mile before stopping his vehicle, it was reasonable for Deputy Fuston to find this suspicious given that Deputy Fuston was also observing movements in the vehicle that indicated the vehicle's occupants may be attempting to hide something. Deputy Fuston's order that Ford exit his vehicle was therefore lawful and did not violate the Fourth Amendment.

### D. Deputy Fuston Lawfully Searched Ford's Vehicle

The Court must next determine if Deputy Fuston lawfully searched Ford's vehicle after ordering him out of his vehicle.

The Court first finds that Deputy Fuston had reasonable suspicion to believe that Ford was armed and dangerous, and therefore holds that Deputy Fuston was justified in conducting a pat-down of Ford. "Law enforcement officers may lawfully conduct a 'frisk' or 'pat-down search' of a passenger [or driver] during a lawful investigatory 'stop' if the officer reasonably suspects the passenger [or driver] is armed and dangerous." *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010). Courts consider the "totality of the circumstances" to determine whether an officer had reasonable suspicion, and "[t]he determination is made with reference to the 'collective knowledge of the officers involved, and the inferences reached by experienced, trained officers.'" *Id.* (quoting *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992)).

As Deputy Fuston was attempting to pull over Ford's vehicle, he observed

movements in the vehicle that indicated that the vehicle's occupants may be attempting to hide something.  While witnessing these movements, Deputy Fuston also observed that Ford's car did not immediately yield to Deputy Fuston's request that the car pull over. Moreover, this all took place at night.  Although there may have been an innocent explanation as to why Ford did not immediately pull over his car, or for the movements that Deputy Fuston witnessed in Ford's car, these observations in totality provided Deputy Fuston with a reasonable basis to suspect that Ford may be armed.  *See Burkett*, 612 F.3d at 1107 (holding that officer had reasonable suspicion to believe vehicle's passenger was armed and dangerous in part because passenger made "furtive movements during the time the driver was refusing to comply with the order to stop her vehicle," regardless of "[w]hether or not [passenger's] 'innocent' explanations for his conduct were true").  Also, Deputy Fuston's experience counseled him to be cautious and careful, as he had found guns about five times before in similar circumstances.

The Court next finds credible Deputy Fuston's testimony that he observed the methamphetamine pipe in the driver's side door pocket while the door was open as he was conducting a pat-down of Ford immediately after Ford exited his vehicle.  Deputy Fuston testified that he recognized that the item in Ford's door pocket was a methamphetamine pipe based on his training and experience in law enforcement.  The Court finds that Deputy Fuston's determination that the item in Ford's door pocket was a methamphetamine pipe was reasonable for someone with Deputy Fuston's experience and training.  Therefore, because Deputy Fuston was lawfully conducting a pat-down of Ford when he first observed the methamphetamine pipe, his observation of the methamphetamine pipe did not violate the Fourth Amendment.

However, even if Deputy Fuston did not have reasonable suspicion to conduct a pat-down of Ford, the Court still finds that Deputy Fuston lawfully saw the methamphetamine pipe.  This is because the Court finds credible Deputy Fuston's testimony that the methamphetamine pipe would have been easily visible to him even if he had not conducted a pat-down based on the pipe's location in the door's pocket and Deputy

Fuston's position relative to the vehicle. Therefore, because Deputy Fuston saw the methamphetamine pipe in plain view as a result of the lawful action of asking Ford to exit his vehicle, his observation of the pipe did not violate the Fourth Amendment.

Once Deputy Fuston saw the methamphetamine pipe, he had probable cause to believe there was contraband in Ford's car. The automobile exception to the Fourth Amendment allows "a warrantless search of an automobile stopped by police officers who ha[ve] probable cause to believe the vehicle contained contraband." *United States v. Ross*, 456 U.S. 798, 799 (1982) (citing *Carroll v. United States*, 267 U.S. 132 (1925)); *see United States v. Miller*, 812 F.2d 1206, 1208-09 (9th Cir. 1987) (holding warrantless search of car was proper under automobile exception when officers "detected a strong smell of phenylacetic acid, known to be used in the manufacture of methamphetamine, emanating from [defendant's] car" and "observed a hand gun in plain view on the front floor and laboratory equipment commonly used in the manufacture of methamphetamine on the back seat of [defendant's] car," because "[t]hese plain view, plain smell observations . . . gave the officers sufficient independent probable cause to search [defendant's] car without a warrant"); *see also United States v. Fowlkes,* 804 F.3d 954, 971 (9th Cir. 2015) (holding warrantless search of car was proper under automobile exception when "[o]nce the car was pulled over and [the defendant] was ordered to get out of the car, officers observed small, off-white rock-like chips on the driver and passenger seats in plain view and a green, leaf-like substance inside a clear bag in plain sight"); *United States v. Garcia*, 468 F. App'x 658, at *1 (9th Cir. 2011) (holding warrantless search of car was permissible under automobile exception when officer "saw from outside [defendant's] car a clear baggy containing a crystalline substance resting on the car's center console.").

Because Deputy Fuston had probable cause to believe there was drug-related contraband in Ford's vehicle, Deputy Fuston was permitted to search "every part of the vehicle and its contents that may conceal" drug-related contraband. *Ross*, 456 U.S. at 825. It was reasonable for Deputy Fuston to believe that the center console could contain methamphetamine or other drug-related contraband. Deputy Fuston's search of the center

console and subsequent seizure of the gun found in the center console were therefore both lawful.

### III. CONCLUSION

For the foregoing reasons, Ford's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated:  August 11, 2025

Honorable Barry Ted Moskowitz
United States District Judge

24-cr-2739-BTM